**Opinion issued May 9, 2017**



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-16-00942-CV
_____

## IN THE INTEREST OF T.M. AND E.M., CHILDREN

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-03559J**

---

## MEMORANDUM OPINION

E.M. appeals from the trial court's judgment terminating his parental rights to his daughters, T.M. ("Theresa") and E.M. ("Emma"). In one issue, E.M. contends that the evidence is factually insufficient to support a finding that termination of his parental rights is in the children's best interest. We affirm.

## Background

On April 18, 2014, the Department of Family and Protective Services received a referral alleging neglectful supervision of Theresa (three years old) and Emma (one year old) by their mother, A.N.T. The referral alleged that A.N.T. was charged with child endangerment after being stopped for driving 84 to 100 miles an hour with Theresa in the car. This incident led to her subsequent arrest for possession of cocaine.[1] Theresa was subsequently released into the care of her father, E.M.

On June 24, 2014, the Department received another referral alleging neglectful supervision of Theresa and Emma, this time by E.M. and A.N.T. The intake report alleged that E.M. and A.N.T. were fighting because the Department had become involved and E.M. refused to take a drug test, E.M. had strangled A.N.T. in the apartment, and that A.N.T. had bruises on her back and legs. Theresa and Emma were in the apartment at the time of the altercation. According to the report, E.M., A.N.T., and the children got into E.M.'s vehicle and A.N.T. later jumped out and flagged down police. E.M. was subsequently arrested for possession of a controlled substance, cocaine, and for domestic violence. The report alleged that E.M.'s apartment was filthy with trash everywhere, Theresa and Emma slept on the floor because there was no furniture, E.M. was going to be evicted from the apartment, Emma had a diaper rash down to her thighs, Theresa's hair was knotted,

---

[1]     A.N.T. had twenty-five grams of cocaine in her possession at the time of her arrest.

2

and that the children needed to be bathed. The children were removed from E.M.'s care the same day.

On June 25, 2014, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, accompanied by the affidavit of Jerri Thomas, a Department caseworker. In its petition, the Department requested that it be named temporary managing conservator of Theresa and Emma. In her affidavit, Thomas cited the children's exposure to A.N.T.'s drug use and possession, E.M.'s drug possession while Theresa and Emma were in his care, and the parents' domestic violence in the presence of the children, in support of the Department's request that the children be removed and that it be named temporary managing conservator.

On September 4, 2014, the Department created a family service plan for E.M. which required, among other things, that he complete a psychosocial evaluation and follow all recommendations; successfully complete domestic violence classes; maintain contact with the Department caseworker at least once a month; maintain stable and safe housing for a minimum of six months consecutively and provide the caseworker with a current lease and utility bills; provide the caseworker with all sources of income by the 15th of each month or, if not employed, proof of his registration with WorkSource and a list of at least three employers to whom he has submitted an application; refrain from engaging in any criminal activities; complete

3

a drug/alcohol assessment and follow all recommendations; participate in drug/alcohol testing and show progress by testing negative for drugs and alcohol; and successfully complete parenting classes.

The trial began on November 30, 2015, and was recessed until February 1, 2016, at the request of A.N.T.'s counsel.[2] When trial resumed, Deputy L. Lizcano with the Harris County Constable's Office testified that her sergeant was flagged down in response to a disturbance involving A.N.T. and E.M. in June 2014. When Deputy Lizcano arrived at the scene, A.N.T. told her that she and E.M. had had an argument in his car and that she had jumped out. Deputy Lizcano testified that A.N.T. had bruises on her back, neck, and legs. A.N.T. told her that E.M. had hit and choked her during an argument that morning and that he had beaten her a few days earlier. Deputy Lizcano then accompanied A.N.T. back to her apartment to look for the children. Deputy Lizcano described the apartment as dirty with trash everywhere, and furnished only with a blow-up mattress on the floor. A.N.T. told Deputy Lizcano that she was not supposed to be around her children because she had been arrested for having a suitcase full of drugs that belonged to E.M. while one of her children was with her, and that the children had been removed from her care.

---

[2] The recess was requested so that A.N.T., who was incarcerated at the time, could appear at trial.

A.N.T. also told Deputy Lizcano that E.M. was a drug dealer, that he kept the drugs in his truck, and that she had been with him on several drug deals.

Deputy Lizcano was then dispatched to a nearby car wash gas station where she found E.M., Theresa, and Emma. Deputy Lizcano testified that the two little girls "looked bad": the toddler's hair was badly matted, and the infant was wearing a dirty diaper and had a severe diaper rash down her thighs. Deputy Lizcano testified that A.N.T. changed the infant's diaper and that E.M. had ointment in the car for Emma's rash. Deputy Lizcano testified that E.M. was subsequently taken into custody and that the Department picked up the children.

After a recess, trial resumed on October 7, 2016. Prior to calling its first witness, the Department introduced numerous exhibits, which the trial court admitted, including the following: E.M.'s conviction for possession of a controlled substance, for which he was sentenced to seventy days' incarceration; E.M.'s plea of guilty to misdemeanor theft, for which he received deferred adjudication; E.M.'s October 15, 2014 drug test, with positive results for cocaine and marijuana; E.M.'s February 4, 2015 drug test, with positive results for cocaine; E.M.'s August 24, 2015 drug test, with positive results for cocaine and marijuana; E.M.'s November 30, 2015 drug test, with positive results for amphetamine, methamphetamine, cocaine, and marijuana; E.M.'s February 8, 2016 drug test, with positive results for cocaine and

5

marijuana; E.M.'s March 3, 2016 drug test, with positive results for cocaine; and E.M.'s May 20, 2016 drug test, with positive results for cocaine.

Sergeant L. Gonzales with the Harris County Constable's Office testified that, on June 24, 2014, A.N.T. flagged him down and told him that she had been assaulted by her husband, E.M. Sergeant Gonzales testified that A.N.T's neck was red and that she had bruising on her back and legs. Sergeant Gonzales accompanied A.N.T. to her apartment which he described as "pretty filthy," with trash in the rooms, and no furniture except a blow-up mattress in the living room. Sergeant Gonzales subsequently located E.M., Theresa, and Emma and conducted a pat down search of E.M. which uncovered thirty-seven light blue pills in E.M.'s right front pocket. E.M. told the sergeant that they were his wife's pills and that he was holding them for her. Sergeant Gonzales then searched E.M.'s vehicle where he discovered a bag with several grams of cocaine and brass knuckles. According to Sergeant Gonzales, there were no car seats in E.M.'s vehicle. Sergeant Gonzales stated that A.N.T. denied that the blue pills found on E.M. were hers, and that E.M. denied assaulting A.N.T. and instead claimed that she was gone for a couple of days and had the bruises when she returned home. E.M. was arrested for possession of a controlled substance.

E.M. testified that the Department first became involved with his children when A.N.T. got arrested for drug possession in April 2014. E.M. suspected A.N.T.

6

had a drug problem because she lost a significant amount of weight quickly. He testified that he was not using or selling drugs at that time.

E.M. testified that, at the time of his arrest, he was in the process of moving to another apartment and had left his job as a draftsman to get an oil field job in the country because he was having issues in the city. He testified that he was storing the children's furniture at his sister's house until he moved. E.M. testified that there were car seats in his vehicle at the time of his arrest. E.M. stated that the Department took custody of the children the day he was arrested and that he was sentenced to seventy-four days' confinement.[3]

When asked about his positive drug tests following his release from jail, E.M. testified that he had a drug test done somewhere else and that it came back clean. With regard to his service plan, E.M. testified that he completed parenting classes and a substance abuse assessment. He also completed a battering intervention program but had to attend a second program after he was discharged from the first one due to his failure to show up. E.M. denied engaging in domestic violence with A.N.T. He also denied using drugs and explained that his positive tests results could have been the result of getting a "contact high" from being around other people with

---

[3] The judgment of conviction reflects that E.M. was incarcerated for seventy days and that he was credited with seventy-two days of time served.

drugs. He stated that he was around people dealing drugs in 2015 but that he is not often around them anymore.

In addition to Theresa, Emma, and his infant son, K.M., E.M. has four other children ranging in age from twelve to seventeen years old who live with their mother.[4] E.M. acknowledged that he has not paid any child support, or provided diapers or clothes, for Theresa and Emma since they have been in the custody of the Department, but he questioned whether anyone had asked him to pay child support. E.M. testified that he has refrained from engaging in criminal activity as required by his service plan despite being charged with theft in August 2016. According to E.M., he could have gotten the charge dismissed but instead accepted deferred adjudication because he did not have time to deal with going back and forth to the courthouse.

E.M. testified that, upon his release from jail in 2014, it took him approximately six months to find a job. He worked as a dishwasher at Pei Wei for eight months and then at a golf course for approximately two months when he was arrested for theft. At the time of trial, E.M. had been working for a printing service company for approximately three weeks. E.M. stated that he has had four jobs and lived in three different places over the course of the case.

---

[4]    When asked about child support for his other children, E.M. testified that he "paid up in full" and owes no further support to their mother.

E.M. testified that, when A.N.T. was arrested in April 2014, the Department approached him about taking Theresa and Emma. According to E.M., the Department conducted two home visits and that the caseworker did not have any concerns about his ability to take care of the children. E.M. testified that the girls were in great condition when they lived with him, they were developmentally on target, and they had no special needs. E.M. testified that A.N.T. visited the girls after she was released from jail in April 2014, but that he never left her alone with the girls because that was one of the conditions under which the Department released the children into his care.

E.M. testified that, on the day he was arrested in June 2014, A.N.T. had come over to his apartment at about 6:30 a.m. At 8:00 a.m., Thomas, the Department caseworker, called to tell him that A.N.T. had made an allegation to the Department that E.M. was using drugs and that he needed to take a drug test. A.N.T. told E.M. that she wanted to watch the children instead of E.M. dropping them off with the babysitter on his way to work. E.M. testified that when he refused, A.N.T. became upset and would not leave the apartment. According to E.M., he picked her up and put her outside the apartment but did not harm her. E.M. stated that, after Thomas's call, he had a bad feeling that morning and thought A.N.T. was going to set him up.

E.M. testified that he left the apartment with A.N.T. and the girls and intended to drop A.N.T. at her friend's house. When they were two blocks away from the

9

apartment, A.N.T. became upset and jumped out of the car. E.M. then took the girls to the nearby washateria so he could do some wash. While he waited on the laundry, he took Theresa and Emma outside where they played in the dirt. He testified that he bought some candy for the girls at the corner store, and that Emma got the candy on her clothes and Theresa's hands became sticky from the candy. According to E.M., Theresa has a habit of twirling her hair which causes knotting. He testified that the matting in Theresa's hair was due to her twirling her hair the previous night and her sticky fingers.

E.M. stated that he found a bag of pills underneath the passenger seat where A.N.T. had been sitting before jumping out of the car. When the police arrived at the washateria thirty minutes later, they discovered the pills on him. According to E.M., after the police searched his vehicle and were unable to find anything, A.N.T. got in the car and pulled something out and gave it to an officer. E.M. stated that, as a result of his drug conviction, he lost his job and his apartment and his vehicle was impounded.

E.M. stayed with his cousin for a month and then lived on the streets for a while during which time his younger brother gave him money. E.M. testified that his cousin gave him money as well, that he visited his cousin's house twenty or thirty times during the pendency of the case (the last visit was in January 2016), and that

he saw people there using cocaine. He testified that his cousin was later arrested for drugs.

E.M. initially testified that he had not used any drug during the pendency of the case. He later stated that, other than smoking marijuana on November 26, 2015, he has not used any drugs. E.M. acknowledged that he told the trial court during a November 2015 hearing that he had been using cocaine, but only because his attorney advised him to admit it.

At the time of trial, E.M. had been living in his apartment since February 2016. E.M. admitted that the lease has his friend Gabriel Castada's name on it, and that the leasing office did it so that E.M. would be able to lease the apartment. E.M. stated that when the children's guardian ad litem visited him in April 2016, he owned two vehicles. He testified that he bought the second vehicle because the first one began to have problems and he needed to be able to drive to work. When asked why he bought a second vehicle when he claimed not to have any money to pay child support or provide anything for the children, E.M. responded that nobody ever asked him to support the children.

E.M. testified that he had no reason to believe that A.N.T. was using drugs before her arrest in April 2014. According to E.M., A.N.T. did not appear unstable or unreliable while caring for Theresa and Emma. He further testified that A.N.T.

11

had previously taken the girls out by herself so he had no reason for concern when she left with Theresa the evening of her arrest.

E.M. testified that when he visited the girls during the case, they ran up to him and smiled, and that he played with them and read books to them during visits. When asked about his future plans for Theresa and Emma, E.M. responded that he intended to take great care of them.

Trial continued on October 28, 2016. Tenille Whitlock, the conservator caseworker, testified that the Department initially received a referral alleging neglectful supervision of Theresa by A.N.T. who reportedly engaged in drug use and intercourse in Theresa's presence. A.N.T. led police on a high-speed chase that resulted in her arrest. Pursuant to a parental child safety placement plan, the Department released Theresa and Emma into E.M.'s care with an agreement that he would not permit A.N.T. unsupervised visitation with them.

Whitlock testified that, in June 2014, the Department received a referral of neglectful supervision of the children by E.M. and A.N.T., involving allegations of domestic violence and drug possession. She stated that the report was validated after police found drugs in E.M.'s vehicle with the children present and A.N.T. was observed with bruises.

Whitlock developed family services plans for A.N.T. and E.M. and reviewed E.M.'s plan with him while he was in jail on the drug charge. E.M. gave Whitlock

12

the following names of several relatives as possible placements for the children: Sandra Ortega, Jennifer Ortega, Faye Bishop, and Christy Thornton. Sandra and Jennifer Ortega told her Whitlock that they would think about it but that they never returned Whitlock's calls. Faye told Whitlock not to call her again about the case, and Thornton was not a suitable placement due to a previous history with the Department. E.M. gave Whitlock several more names of possible placements: his sister, Tierasha Adair, Reverend Ruben Wade, and Lastephine Richards. When contacted, Reverend Wade and Richards told Whitlock that they would have to discuss it with their families but they neither called back nor returned the Department's calls. As for Adair, the children's paternal aunt, Whitlock indicated that she was a prospective placement but that Adair later called Whitlock back and told her that E.M. had come by her house and "suggested some words to her," and that she would not be able to take the children.

With regard to the required tasks of his family service plan, Whitlock testified that E.M. completed a psychosocial evaluation and parenting classes, and that he submitted to drug tests, but that he did not follow the recommendation that he attend Alcoholics Anonymous meetings. After three failed attempts, E.M. ultimately completed domestic violence classes. Whitlock testified that, other than a period between February to May 2015, E.M. has maintained contact with her.

13

The plan also required that E.M. maintain stable housing for a minimum of six months and provide proof of a lease and utility bills. Whitlock stated that E.M. provided her with an apartment lease but later indicated that he was actually sub-letting the apartment from Castada. Whitlock has been unable to validate the lease and E.M. has not provided her with any utility bills. Whitlock also stated that E.M. has not provided her with the identifying information of any adult living in his home as required by his service plan. When Whitlock conducted a visit on May 4, 2016, there was a female present in E.M.'s apartment. When she asked the woman for her information, the woman gave Whitlock her first name only, and E.M stated that she was only going to be there a short time. Whitlock testified that there was living room furniture and a trundle bed for the girls in the apartment.

The plan also required E.M. to provide his caseworker with proof of all sources of income. Whitlock testified that, other than paycheck stubs presented to the court in November 2015, E.M. has not provided any proof of his income. Whitlock also testified that E.M. has not complied with the plan requirement that he refrain from engaging in criminal activity because he was arrested for theft in August 2016.

With regard to E.M.'s drug tests, Whitlock testified that most of E.M.'s urinalysis tests were negative but that he had seven positive hair follicle tests between October 2014 and May 2016. Whitlock testified that E.M. participated in

a substance abuse assessment in 2014 in which he disclosed that he did not use drugs but that, in light of his positive drug test results, he did not provide truthful answers in his assessment.

The plan also required E.M. to demonstrate and verbalize learned behaviors consistent with his children's ages and developmental capacities during family visits and to verbalize learned behaviors to his caseworker. Whitlock stated that E.M. has never verbalized ways in which he can nurture his children. In his visits with the children, E.M. would either take selfies or pictures with them, or the children would play in the room while he sat back in the corner. Whitlock stated that E.M. had bi-monthly visits scheduled during the case, and that he missed visits in October and November 2014 as well as his visits from February to May 2015.

During his last visit in October 2016, E.M. came with another woman and her two children to the visit. Whitlock testified that E.M. sat in the corner of the room during the entire visit, and that after the children began to eat the snacks Whitlock had provided for Theresa and Emma, she asked the other woman to take the children out of the room. Whitlock stated that E.M.'s eyes were red and glazed, and that when she asked him what was wrong, he told her that he had a migraine. Whitlock asked E.M. to take a drug test after the visit. The results of the urinalysis test were negative but his hair follicle test was positive for cocaine and marijuana. As a result of that visit and his regular positive drug tests, the Department requested that E.M.'s

visitation be stopped. E.M. subsequently sent Whitlock several text messages. In one text, E.M. wrote, "I took care of my daughters for eight months alone before you whores stepped in our life" and "Tenille, I promise you I always get even in the end." E.M. denied that the message was intended as a threat.

Whitlock testified that Theresa and Emma have not once asked her about E.M. during the pendency of the case. Whitlock testified that when Theresa came into the Department's care, she had a small frame and the caregivers had to cut her hair because of the severe matting. Whitlock stated that Theresa was very quiet and not developmentally on target, and that Emma was also very quiet and had some difficulty with motor skills, particularly with her ability to walk. While in the Department's care, Theresa has received speech therapy and Emma has received speech therapy and occupational therapy. According to Whitlock, the girls have since blossomed. Both girls are developmentally on target. Theresa is currently in kindergarten, is very talkative, follows direction well, and has begun learning sight words. Emma is doing much better and is speaking more although she still has some issues with her motor skills and her balance that require daily hands-on work to help her continue to develop.

Theresa and Emma have been in an adoptive placement since May 2015. Whitlock testified that they refer to their caregivers as Mommy and Daddy, and are bonded with them as well as the family's young adoptive son whom they refer to as

16

their brother.  Whitlock stated that the children's current placement is appropriate, the girls are happy with their caregivers, and the caregivers would like to adopt the girls.

After their son K.M. was born, E.M. and A.N.T. provided the following names as possible placements for all three children: Cherrelle Valentine, Shatiqua Ross, Patricia Hood, Jacqueline Wilmore, Kiara Walker, and Jonathan Manuel.  Whitlock testified that although Valentine provided her information for a background check and told Whitlock that she would discuss it with her family, she never responded to the Department's calls or letter.  Ross did not respond to the numerous messages left by the Department.  Hood stated that she did not have enough furniture and was diabetic but would consider being a foster parent in two years once she was retired.  Wilmore told Whitlock that she was ill and did not have a back-up plan for the children, and that she could be a temporary placement only.  The Department attempted to contact Walker but her phone number did not work.  Manuel, the children's paternal uncle, came to one of the family visits but told Whitlock that he barely had a place to stay himself and was unable to take the girls.  Whitlock testified that the Department has made every effort to try and place Theresa and Emma with a family member but that no one has been willing or able to take the children.

Whitlock testified that the Department was seeking termination of E.M.'s parental rights to Theresa and Emma and that the Department believed that

17

termination is in the children's best interest because E.M. failed to comply with the family plan of service and had repeated positive drug tests from October 2014 until March 2016. Whitlock stated that E.M. admitted to being in and out of a drug house to get money and that he has not shown that he can provide the children with a safe and stable environment. She further stated that E.M. never brought diapers, clothes, or presents for the girls' birthdays or for Christmas. Whitlock testified that the Department's goal for Theresa and Emma was unrelated adoption.

A.N.T. testified that E.M. was a family man and involved in his children's lives. She stated that E.M. provided financially for all of his children and bought toys, games, clothes, and shoes for them. A.N.T. stated that E.M. never threatened her or became angry with her.

According to A.N.T., she first started using drugs around Easter 2014 because she and E.M. were having problems stemming from the fact that E.M. had had an affair and A.N.T. was hanging out with her mother, a drug addict. A.N.T. testified that she went by the apartment to see the children in June 2014. Before going into the apartment, A.N.T. put three grams of cocaine in E.M.'s car because she did not want to bring drugs around the children. She testified that she became mad when E.M. would not let her watch the girls instead of dropping them off at the babysitter. She initially got into the car with E.M. so that he could drop her off at a friend's house but later jumped out because she was still angry at him. She flagged down an

officer and told him that E.M. had hit her because she was "out for revenge." She testified that when she heard E.M. tell the police that the pills were hers, she became angry that he would not "take this charge" for her so she also told the police that he had drugs in the car. A.N.T. testified that, despite what she told the officer at the time, her bruises were not caused by E.M. but rather from sleeping under a bridge with her mom the previous night. She also stated that she, not Sergeant Gonzales, pulled the cocaine out of the car. After E.M. was released from jail, he and A.N.T. were homeless together for a while. A.N.T. testified that she and E.M. had several family visits with the girls and that the visits were great.

According to A.N.T., she and E.M. did drugs twice together. She stated that E.M. knew she was using drugs and that he used to throw them out of the window when he was driving which made her mad. When A.N.T. found out that she was pregnant with K.M., E.M. told her to slow down and tried to help her get sober and clean. She stated that E.M. began using drugs because of the pressure he was under trying to get her clean. She stated that she lied to Thomas when she told her that E.M. was using drugs in June 2014 because she was mad that he would not allow her to see the children unsupervised.

At the conclusion of trial, the trial court found that termination of E.M.'s parental rights to Theresa and Emma was warranted under subsections (D), (E), and

(O) of Family Code section 161.001(b)(1),[5] and that termination was in the

children's best interest.[6] The trial court signed its termination order on November

7, 2016. This appeal followed.

## Discussion

On appeal, E.M. acknowledges that the evidence is factually sufficient to

support the predicate findings under subsections (D), (E), and (O) and does not

challenge those findings on appeal. He also notes that this evidence is legally

---

[5]    As relevant here, section 161.001(b)(1) states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]
>
> . . . .

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) & (O) (West 2014).

[6]    The trial court also terminated A.N.T.'s parental rights based on her affidavit of relinquishment pursuant to section 161.001(b)(1)(K), and found that termination was in the children's best interest.

20

sufficient to support the trial court's finding that termination was in the children's best interest. In his sole issue, E.M. argues that the evidence is factually insufficient to support the trial court's best interest finding.

**A. Burden of Proof and Standard of Review**

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007

(West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.

When conducting a factual sufficiency review, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the fact finder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Best Interest of the Child

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2014).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all of the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the

23

willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2014); *In re R.R.*, 209 S.W.3d at 116.

### 1. Children's Desires and Needs, and Plans for the Children

The first and second *Holley* factors consider the desires of the child and the present and future physical and emotional needs of the child. *Holley*, 544 S.W.2d at 372. The sixth *Holley* factor looks at the plans for the child by the individual or agency seeking custody. *Id.*

When children are too young to express their desires, the factfinder may consider whether the children have bonded with the proposed adoptive family, are well-cared for by them, and whether they have spent minimal time with a parent. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas

24

2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

At the time of trial, Theresa was four years old and Emma was two years old and, thus, too young to testify about their desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The trial court heard testimony that Theresa and Emma have been in a foster placement since May 2015, that they are bonded with their foster parents whom they refer to as Mommy and Daddy, and that they are also bonded with the family's young adoptive son whom they refer to as their brother. Whitlock testified that the children's current placement is appropriate, the girls are happy with their caregivers, and that the foster parents would like to adopt the girls. E.M. testified that when he visited the girls, they ran up to him, smiling. The trial court also heard testimony that Theresa and Emma did not once ask about E.M. during the pendency of the case.

E.M. testified that when the children lived with him, they were developmentally on target and had no special needs. When asked about his plans for Theresa and Emma, E.M. testified that he plans to take great care of them. Whitlock testified that when Theresa came into the Department's care, she was very quiet and not developmentally on target. She testified that Emma was also very quiet and had some difficulty with motor skills, particularly her ability to walk. While in

25

the Department's care, Theresa has received speech therapy and Emma has received speech therapy and occupational therapy. According to Whitlock, the girls have since blossomed and are developmentally on target. Theresa is currently in kindergarten, is very talkative, follows direction well, and has begun learning sight words. Emma is doing much better and is speaking more although she still has some issues with her motor skills and her balance that require daily hands-on work to continue in her development. This evidence supports the trial court's best interest finding under the first, second, and sixth *Holley* factors. *See also* TEX. FAM. CODE ANN. § 263.307(b) (listing child's age, child's physical and mental vulnerabilities, and parent's understanding of child's needs and capabilities among factors to be considered in determining whether child's parents are willing and able to provide child with safe environment).

### 2. Endangering Conduct and Parental Acts or Omissions

The third *Holley* factor is the present and future physical danger to the child. *Holley*, 544 S.W.2d at 372. The eighth factor considers acts or omissions of the parent that indicate the parent-child relationship is improper. *Id.*

The evidence shows that E.M. tested positive for illegal drugs, including cocaine, seven times between October 2015 and May 2016. With regard to his drug usage, E.M. provided conflicting testimony. At trial, E.M. initially testified that he did not use drugs and that that his positive drug tests could have been the result of

26

getting a contact high from being around other people with drugs. He subsequently testified that, other than smoking marijuana in November 2015, he has not used any drugs during the pendency of the case. However, E.M. later acknowledged that he admitted to the trial court at a November 2015 hearing that he had been using cocaine but stated that he said it only because his attorney advised him to disclose it.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). E.M.'s inability to refrain from drug use during the pendency of the case reflects an inability to perceive the danger that parental drug use would pose to a child. *See In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *6 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (mem. op.) (concluding that father's concealment of drug use and continued relationship with mother who abused drugs demonstrated father's inability to perceive danger that parental drug use posed to child).

E.M. argues that the most salient feature of his test results is the declining level of drugs over time and the fact that his last test in June 2016 was negative. However, a fact finder is not required to ignore a history of narcotics use merely because it abates as trial approaches. *See Cervantes-Peterson v. Texas Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 254 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (concluding that despite mother's contention that she had stopped

using cocaine and marijuana, trial court was not required to ignore her history of narcotics use merely because she testified that it had abated before trial); *In re M.G.D.*, 108 S.W.3d 508, 513 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting that jurors are not required to ignore long history of dependency and abusive behavior merely because it abates as trial approaches). Further, Whitlock testified that she asked E.M. to take a drug test following his visit with the children in October 2016, and that the results of the test were positive for cocaine and marijuana.

Moreover, E.M.'s arrest in June 2014 stemmed from A.N.T.'s report to police that he had physically abused her, and E.M. was convicted for possession of a controlled substance after the police found Xanax in his pocket and cocaine in his car. E.M. also testified that he was around people dealing drugs in 2015 but that he is not often around them anymore, that he visited his cousin's house twenty or thirty times during the pendency of the case (with the last visit in January 2016) where he saw people using cocaine, and that the cousin, with whom he had once lived, was later arrested for drugs. *See In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best interest finding).

This evidence supports the trial court's best interest finding under the third and eighth *Holley* factors.

### 3. Parental Abilities and Stability of the Home

The fourth *Holley* factor is the parental abilities of the person seeking custody. *Holley*, 544 S.W.2d at 372. The seventh factor looks at the stability of the home or proposed placement.

Among other tasks, E.M.'s family service plan required that he demonstrate and verbalize learned behaviors consistent with his children's ages and developmental capacities during family visits and verbalize them to his caseworker. Whitlock testified that E.M. never verbalized ways in which he could nurture his children. During his family visits, E.M. would either sit and take selfies or pictures with the children, or sit back in the corner while the children played. E.M. testified that, contrary to Whitlock's testimony, Theresa and Emma ran up to him when he arrived for visits, and that he played with them and read them books. Whitlock stated that E.M. had bi-monthly visits scheduled during the case and that he missed visits in October and November 2014 and the visits from February to May 2015.

Whitlock also testified that E.M.'s eyes were red and glazed at his last family visit in October 2016. Whitlock asked E.M. to take a drug test after the visit and the results of the urinalysis were negative but the hair follicle test was positive for cocaine and marijuana. A parent's exercise of poor judgment currently and in the

29

past demonstrates an inability to provide adequate care for the child. *See In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (noting parental drug abuse is reflective of poor judgment and is also factor to be considered in best interest analysis); *Wischer v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151 at *10 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.).

On the day of E.M.'s arrest in June 2014, Deputy Lizcano and Sergeant Gonzales described E.M.'s apartment where he lived with Theresa and Emma as dirty with trash everywhere, and with the only furniture being a blow-up mattress on the floor. E.M. testified that he was in the process of moving to another apartment and that the children's furniture was at his sister's house.

E.M.'s family service plan required that he maintain stable housing for a minimum of six months and provide proof of a lease and utility bills. E.M. testified that he has held four jobs and lived in three different places over the course of the case. Whitlock stated that E.M. provided her with his current apartment lease but later told her that he was actually sub-letting the apartment from a friend. At the time of trial, Whitlock was unable to validate the lease and E.M. has not provided her with any utility bills. Whitlock testified that there was living room furniture and a trundle bed for the girls in the apartment.

E.M.'s family service plan also required E.M. to provide his caseworker with proof of all sources of income. Whitlock testified that, other than paycheck stubs presented to the court in November 2015, E.M. has not provided proof of income to Whitlock. The trial court heard testimony that E.M. bought a second vehicle while at the same time he claimed not to have any money to provide support for the children. This evidence supports the trial court's best interest finding under the fourth and seventh *Holley* factors. *See also* TEX. FAM. CODE ANN. § 263.307(b) (listing adequate parenting skills and a safe physical home environment as factors to be considered in determining best interest of child).

In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of E.M.'s parental rights is in Theresa and Emma's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold that the evidence is factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the children's best interest. Accordingly, we overrule E.M.'s issue.

**Conclusion**

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.